JOHN KEETON'S HEIRS, Appellants, *vs.* WM. KEETON'S ADMINISTRATOR, Respondent.

1. Where an administrator, at a fraudulent sale made by him, becomes the purchaser of slaves belonging to the estate of his intestate, and afterwards, with the knowledge of the heirs, openly and notoriously asserts title in himself, a bill in equity cannot be maintained against him for relief, after the lapse of the period which is a bar by the statute of limitations.

2. If a complainant relies upon a disability as exempting him from the operation of the statute of limitations, he should set it up in his bill.

3. It is settled that a person out of this state, but within the United States, is not within the meaning of the words "beyond seas" in the statute of limitations of 1825.

4. Cumulative disabilities are not allowed. So, where a cause of action accrues in favor of an infant female, the statute begins to run from the time she becomes of age, although she previously marries. But where two disabilities exist when the cause of action accrues, the statute does not begin to run until they are both removed.

5. One party, who is saved from the operation of the statute of limitations by a disability, can obtain no relief upon a bill in equity jointly with other parties who are barred.

6. Where a bill in chancery, to which limitation was set up as a bar, contained

no allegation of any exempting disability, but it appeared in evidence that that some of the complainants had been under a disability which prevented a bar, though the others had not, the supreme court reversed a decree dismissing the bill, in order to afford an opportunity to amend, so as to save the rights of those who were not barred.

7. Facts stated, which, in the opinion of the court, showed fraud in a sale by an administrator of slaves belonging to the estate of his intestate.

*Appeal from St. François Circuit Court.*

This was a bill in chancery, filed in March, 1848, by the heirs of John Keeton, to recover certain slaves, (with the value of their hire and services,) claimed by them to have been held by William Keeton, the defendant's intestate, (who had administered upon the estate of their father,) as their trustee, and by the defendant to belong to his intestate's estate.

About the year 1824, John Keeton, who had previously resided in Franklin county, Tennessee, where he had become somewhat embarrassed, came to Jefferson county, Missouri, leaving behind him his farm, with other property, and his family, consisting of a wife and six children, and bringing with him about twenty slaves, in order, as it appeared, that he might prevent them from being sold under execution, and with the avails of their labor pay off his debts. The male slaves were employed by him, after he reached Missouri, in mining, and the females were hired out. Being successful in his mining operations, he returned to Tennessee in the spring of 1825, and according to one witness, again in the spring of 1826, each time taking with him money which he applied to the payment of his debts. There was evidence of a difficulty between him and his wife, which prevented them from living together, and of declarations by him of an intention to make Missouri his permanent home, and other evidence of declarations of his intention to return to his family in Tennessee, after he had made money sufficient to discharge his debts. On the 2d of September, 1826, soon after his second return from Tennessee, he died in Jefferson county, leaving there the slaves and some other personal property, but no real estate. On the 8th of the

same month, letters of administration on his estate were granted to M. Taney. In March, 1827, upon the application of William Keeton, who had previously obtained letters of administration in Tennessee, an order was made granting letters *de bonis non* to him, revoking the letters to Taney. The order recited that it was proved to the court that the applicant was of kin to the deceased and a creditor of his estate. In September, 1827, William Keeton made a settlement of his administration in this state, showing a balance of money in his hands of $288 67, and containing a list of the slaves in his possession, twenty-one in number. No other settlement was made by him until November, 1830, when he made his final settlement, showing no increase of assets since the former settlement, but disbursements to the amount of $231 65, leaving $57 62 to be distributed. The record showed no order of distribution, or other order in relation to this balance, nor any order in relation to the slaves. It appeared that in the fall of 1827, the administrator carried all the slaves belonging to the estate to Tennessee. In the settlement of his administration there, he was charged with their hire from January 1st, 1828, up to the time of their sale in 1830, as hereinafter stated. No hire for the year 1827 was charged either in the Missouri or Tennessee administration. The balance due the estate on the final settlement in Missouri was charged to the administrator in the Tennessee administration.

In February, 1830, the court of Pleas and Quarter Sessions of Franklin county, Tennessee, made an order for the sale of the slaves. The order recited that there were unpaid debts against the estate to the amount of upwards of a thousand dollars, to pay which a sale of some of the slaves was necessary, and that the sale of the remainder was believed to be necessary, in order to make an equal distribution among the heirs, and that a sale was desired by all the heirs who were of age. Neither the time, terms, place nor manner of sale were prescribed. Under this order, the sale was made by the administrator at public auction, for cash, on the 5th of March, 1830,

at the farm of John Keeton, the home of his widow and chil-
dren, all of whom, as was testified, were present or represented
at the sale.  John Keeton had one son and two daughters by
his first marriage, and three daughters by his second marriage.
The five daughters and their husbands were the complainants in
this suit.  It appeared that Catharine, the eldest daughter,
though of age at the time of the sale, was married to Robert
Keeton, who was present and bid off two of the slaves.  Sy-
tha, the next daughter, was, as one witness testified, some
eighteen or twenty years of age, but it did not appear whether
she was then married.  All the other daughters were under
age and then unmarried.  Clarissa, the youngest, was born in
November, 1822, and not married until 1837 or 1838.  One
witness, however, stated that she was seventeen years old when
she married in 1838.  It was in evidence that much dissatis-
faction was expressed by the persons present, because the sale
was for cash, instead of on the usual credit, and that many
persons were prevented from bidding in consequence; that the
terms were not known until the day; and that the slaves would
have brought better prices if they had been sold on the usual
terms.  It did not appear what, if any, notice of the sale was
given, and a witness, who lived in the neighborhood, stated that
he never heard of it until it had taken place.  Every witness,
who undertook to speak positively upon the subject, testified
that all of the slaves were bid off by William Keeton, except the
two bought by his brother, Robert.  There was much evidence
that, after the sale, William, with the knowledge of the heirs,
claimed the slaves bid off by him as his own, and exercised
ownership over them, and not long afterwards removed a por-
tion of them to Missouri, where they remained in his posses-
sion until his death in 1845, when they came into the hands of
his administrator, from whom, they and their increase are
sought to be recovered in the present suit.  One witness, how-
ever, testified to a declaration by William Keeton after the sale
 hat he had bid off the slaves for the benefit of the widow and
heirs.

It was claimed by the defendant that the slaves were bid off by William Keeton at the sale for Elizabeth Keeton, who was his sister, and the widow of John Keeton; and there was produced in evidence a bill of sale dated April 23, 1832, more than two years after the sale, from said William to Elizabeth for the slaves, eighteen in number, reciting that they had been purchased by her at the sale *and then delivered.* There was also produced a bill of sale of the same date from Elizabeth back to William for ten of the same slaves, reciting that she was indebted to him, after deducting her own distributive share in the estate and those of her three daughters, for whom she was guardian, in the sum of $2,691, for advancements made by him for the estate, in payment of which he had agreed to take the negroes.

At the November term, 1830, the court appointed commissioners to settle with the administrator, who, on the 10th of March, 1831, reported a balance in his hands of $5,002 05¼. He was charged with $6,689 99 as the amount for which the slaves sold. At the February term, 1832, commissioners were again appointed to settle, who in March, 1833, reported that the administrator, since the last settlement, had paid debts amounting to $923 28½ for which he was entitled to a credit.

In the settlement of her accounts as guardian of Margaret, Martha and Clarissa, her three daughters, Elizabeth Keeton charged herself with $586 07¾ received from the administrator of John Keeton, as the distributive share of each in the estate. There were also produced in evidence receipts from the husbands of Martha, Margaret and Clarissa, dated respectively February 12, 1836, November 17, 1838, and March 30, 1841, acknowledging the receipt in full of the distributive shares of their wives, and releasing the administrator and guardian. The first two of these receipts did not specify the amount received, but the last stated it at $600. The receipts of the son of John Keeton and of the husbands of his two remaining daughters were also produced, dated April 9, 1831, March 5, 1831, and

April 9, 1831, for $586 07¾ as the respective distributive shares of each.

Evidence was offered tending to show that these receipts were unfairly obtained, and that at least some of the shares had not been paid, or not in full, and that others were paid in negroes or in land. A number of witnesses testified that William Keeton had no property of consequence before he became the administrator of John Keeton, and did not pay his debts, and that afterwards he assumed the appearance of being a man of wealth.

It was agreed that the laws of Tennessee in relation to the sale of slaves by administrators should be considered in evidence.

After hearing the evidence, the Circuit Court dismissed the bill, and the complainants appealed. The case was orally argued by Mr. Frissell and Mr. Munford for appellants, and by Mr. Noell, for respondent.

Mr. *Frissell* argued the following points : I. The evidence showed that John Keeton died a citizen of Missouri, and so the Missouri administration was the principal one, and the Tennessee the ancillary. II. The evidence showed fraud in the sale of the slaves, and fraud in the administration generally. The single fact that the administrator became the purchaser was sufficient to avoid the sale. (*Michaud* v. *Girod*, 4 Howard, 556–7. White's Leading Cases in Equity, 127, 139.) III. As the sale was void, the administrator was not thereby divested of his character of trustee. IV. The statute of limitations cannot avail the defendant. 1. If a trustee has ever been allowed to hold trust property under this statute against the *cestui que trust*, it has been *in the absence of fraud* and after a long acquiescence by parties competent to sue. 2. The evidence shows that at least two of the complainants were under disabilities at the time of the sale, one of which still continues, and the other of which was not removed until within five years before the commencement of this suit. (Upon the statute of limitations, the following authorities were cited : Hill on

Trustees, 263. *Falls* v. *Torrance*, 4 Hawks, 412. *Bird* v. *Graham*, 1 Iredell's Eq. Rep. 196. *Prevost* v. *Gratz*, 6 Wheat. 481, 497–8. *Boon* v. *Chiles*, 10 Pet. 177. *Decouche* v. *Savetier*, 3 Johns. Ch. Rep. 190.)

Mr. *Munford* argued the following points: I. The purchase by the administrator at his own sale was a fraud in law which avoided the sale; (same authorities cited by Mr. Frissell.) II. The evidence showed fraud in fact in the sale. III. The statute of limitations is no defence. 1. The trustee of a direct trust, who has been guilty of actual fraud, has never in any case been allowed to protect himself by the statute of limitations at law. (*Michaud* v. *Girod*, 4 Howard (U. S.) Rep. 556–7.) 2. The statute at law will not in any case run against the trustee of an express trust. An administrator is such a trustee, and his character as trustee is not divested by a purchase at his own sale, even though made in good faith. (4 Hawks', 412. 3 Johns. Ch. Rep. 190.) His possession will not be regarded as adverse, even though he declares it so to be. Having obtained possession in the capacity of trustee, he is not allowed to divest himself of the trust. Numerous cases can be cited, where equity has given relief against administrators, after the lapse of time sufficient to have barred an action at law. (*Michaud* v. *Girod*, 4 Howard (U. S.) Rep. 556–7. 3 Johns. Ch. Rep. 190 and cases cited. *March* v. *Russell*, 3 Mylne & Craig, in 14 Eng. Ch. Rep. 2 Merivale, 360. 2 Keen, 750, in 15 Eng. Ch. Rep.) IV. The single question in the case then is, have the heirs slept upon their rights so long, that a court of equity will, under the circumstances, refuse them the relief they ask? and the evidence repels such a conclusion. 1. They were all minors at the time of the sale in 1830, except one, who was married and whose husband is still living. They were all females and all married before they became of age. 2. They filed their bill in 1839 in Tennessee, and the court admitted the fraud, but refused relief against the securities, because the property was in Missouri, out of the jurisdiction of that court. (*Keeton* · v. *Campbell*,

2 Humph. 224.) They then sought relief in Missouri, and again mistook their remedy, as the court decided. (13 Mo. Rep. 347, and same case, 15 Mo. Rep. 136.) 3. The administrator removed the property from Tennessee, where they resided, to Missouri, where he could better conceal his fraud. 4. There was evidence of a declaration by Wm. Keeton that he had bid off the slaves at the sale for the benefit of the widow and heirs, and that he professed to retain possession for them.

Mr. *Noell*, for respondent, argued the following points : I. The evidence established no fraud in fact or in law in the sale of the slaves by the administrator, and it was made under the order of a court of competent jurisdiction. II. If there was fraud, still the claim of the complainants is barred by limitation and lapse of time. 1. It may be admitted that express trusts, and such as are *intentionally created by the act of the parties*, are exempt from the operation of the laws of limitation, so long as the relation of trustee and *cestui que trust* continues to exist. In cases however of constructive trusts, resulting from the fraudulent conduct of the party against whom the trust is attempted to be set up and enforced, the statute of limitations runs. (3 Murphy, 583.) 2. The cases cited by the appellants do not sustain their position. The case of *Michaud* v. *Girod*, (4 Howard,) was decided upon its own peculiar circumstances. The plaintiffs lived in Europe and the fraud was perpetrated in Louisiana, and although they had long slept upon their rights, they did so without full knowledge of the facts. Besides, there was concealment on the part of the administrator. The other authorities cited by them were cases of direct trusts. 3. The disability of infancy, which some of the complainants were under at the time of the sale, expired more than five years before the filing of this bill. The fact of their subsequent marriage before becoming of age will not relieve them from the operation of the statute. Disabilities cannot be tacked. The fact that one of them was married, at the date of the sale, to her present husband, one of the complainants, is immaterial. Her husband was fully competent to

act for her in regard to her personal property, and he was present at the sale. A recovery in this case would enure to his benefit. III. Even if the statute of limitations is no bar, yet a court of equity will not relieve, under all the circumstances of this case, after so long an acquiescence in the sale, and after the death of the administrator, who alone was able to explain the whole transaction. (2 Dev. Eq. Rep. 167, a case directly in point. 1 Id. 58. Ib. 191.)

SCOTT, Judge, delivered the opinion of the court.

1. It cannot have escaped the observation of those whose attention has been called to the subject, that the application of the statute of limitations, in courts of equity, to matters of trust, is made difficult from the contrariety of opinion which prevails in relation to it. Whilst all admit that an express or direct trust is not subject to be barred by the statute, a difficulty is experienced in determining what trusts fall under the denomination of express or direct trusts, as well as in ascertaining the period of limitations to be applied after the character of the trust is determined.

All seem to admit that, when courts of law and equity have a concurrent jurisdiction over a subject, and an action in relation to it is barred at law, a defendant cannot be deprived of the protection of the statute, by converting him into a trustee and suing him in a court of equity. In such cases, the statute is equally available in both courts as a defence.

In the conflict of views, on the question as to what trusts are excluded from the operation of the statute of limitations, we may safely adopt the conclusion of Chancellor Kent, in the case of *Kane* v. *Bloodgood*, (7 Johns. Ch. Rep. 110,) who, after an able review of the cases on the subject, expresses the opinion that the trusts intended by the courts of equity not to be reached or affected by the statute of limitations, are those technical and continuing trusts which are not at all cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of courts of equity.

He says the trust must be a continuing one. There are cases, which maintain that a strict trustee must take care of the interest of his *cestui que trust*, and he is not permitted to do any thing adverse to it; that acts which, if done by a stranger, would be adverse, are not so in a trustee, from its being his duty to abstain from them; that it is at the option of the *cestui que trust*, to treat such acts as adverse or not.

But Chancellor Kent, in the case to which reference has been made, maintains that, if the trustee deny the right of his *cestui que trust* and assume absolute ownership, the remedy of the latter is confined to the period allowed for the recovery of legal estates at law; that so long as the trust is a subsisting one, and admitted by the acts and declarations of the parties, the statute does not affect it; but when such transactions take place between trustee and *cestui que trust* as would, in case of tenants in common, amount to an ouster of one of them by the other, a court of equity would not consider length of time of no consequence. There is no good reason why the statute of limitations should not apply to such a case, as well as to cases of constructive trusts, to cases of detected fraud, and to all other cases in which the statute is assumed as a rule of decision. In the case of *Boone* v. *Chiles*, (10 Pet. 223,) the court says that an express voluntary trust cannot be enforced, after its known disavowal for such time and under such circumstances as would make an adverse possession a bar; that time does not bar a direct trust, as between a trustee and *cestui que trust*, till it is disavowed. In the case of *Robinson* v. *Hook*, (4 Mason, 151,) Judge Story says: "When it is said that the statute of limitations does not apply to cases of trust, it is material to consider the sense in which that proposition is to be understood. In respect to trusts, which are strictly such and recognized and enforced in courts of equity only, such as express trusts created by the parties for particular purposes, the doctrine is in general true. So long as the relation of trustee and *cestui que trust* is admitted, in the case of express trusts, to exist between the parties, the very duties to be per-

formed by the trustee prohibit him in general from setting up such bar. Acts, which, done by a stranger, might be deemed adverse, when done by a trustee, admit of a very different interpretation. But even in cases of express trusts, if an open, public, adverse claim is set up by the trustee against his *cestui que trust*, and the trust itself is denied as any longer subsisting, there is much reason to hold that the bar ought to be admitted to arise from such period." Afterwards, in the case of *Baker against Whiting*, (3 Sum. 486,) the same Judge says : " The doctrine that no time is a bar to a trust, clearly established, is regularly true, when it is received with the proper accompanying limitations ; that no circumstances exist to raise a presumption from lapse of time of an extinguishment of the trust, and no open denial or repudiation of the trust is brought home to the knowledge of the parties in interest, which requires them to act, as upon an asserted adverse title." In the case of *Pipher* v. *Lodge*, (4 S. & R. 315,) it was held that, though as a general rule, the vendor, before conveyance, is a trustee for the vendee, and while his possession can reasonably be reconciled with the existence of the trust, the statute of limitations has no operation ; yet, if he disavows the trust, the vendee having notice will be barred by the statute of limitations of twenty-one years, such acts being evidence of a disseizin. It was thought analogous to the law of tenants in common. One tenant in common, who is in possession of the whole, while he does not deny the right of his co-tenant shall be presumed to hold as tenant in common, and the act of limitation will not attach ; but when he denies the title of his partner, claims the whole exclusively, and will not suffer him to enter, the presumption of an ouster arises, and the statute takes effect. To the same effect is the case of *Walker* v. *Walker*, (16 S. & R. 384.) After a review of the cases on the subject, Angel, in his work on Limitations, 513, says : " Even in cases of direct and technical trusts, if the trustee should deny the right of his *cestui que trust*, and assume absolute ownership, the latter could not be allowed a remedy

beyond the period limited for the recovery of legal estates at law."

In cases of resulting, implied and constructive trusts, when a party is to be constituted a trustee by a decree of a court of equity, founded on fraud, it is well settled as a rule of equity, that the statute of limitations and presumption from lapse of time will operate. With regard to the statute of limitations, it will run from the time that the facts are brought home to the knowledge of the party. He then has a cause of action, and there is no reason for placing him in any better situation than any other suitor. Having a cause and being fully aware of it, there is nothing to prevent the statute from running against him. The statute to be applied in such cases is determined by the nature of the claim. Lord Redesdale, in the case of *Bond* v. *Hopkins*, (1 Sch. & Lef. 429,) says : " If the equitable title be not sued on within the time within which a legal title of the same nature ought to be sued upon, to prevent the bar created by the statute, the court, acting by analogy to the statute, will not relieve. If the party be guilty of such laches in prosecuting his equitable title, as would bar him, if his title were solely at law, he shall be barred in equity. As in suits relating to real estate, courts of equity adopt the limitation of twenty years, that being the period beyond which a writ of entry is barred, so in those relating to personalty, they are governed by the limitation prescribed for personal actions." Angel, 511, says : " It is perfectly clear that, whenever a person takes possession of property in his own name, and is afterwards, by matter of evidence or by construction of law, changed into a trustee, lapse of time may be pleaded in bar. This possession entitles him at least to the same protection as that of a direct trustee, who, to the plaintiff's knowledge, disavows the trust and holds adversely." (*Miller* v. *Mitchell*, 1 Bai. S. C. R. 437. *Buchan* v. *James' Adm'r*, Speer's Ch. Rep. (S. C.) 375.)

From the foregoing principles relating to the application of the statute of limitations in equity for the enforcement of

trusts, which we have endeavored to show are established as law, it will follow that, in whatever light this suit is viewed, whether as one seeking to enforce an express or direct trust, or a constructive one, resulting from the proof of fraud in the person sought to be made a trustee, it is evident that the statute of limitation applies.

In this case, there is no evidence wanting to establish the fact that a great many years ago, William Keeton asserted an adverse title to the slaves in controversy. His assertion was open and notorious, accompanied with the possession of the property and claim of ownership. The fact is stated in the bill that a short time after the sale, Keeton held the slaves as his own property, and that they remained under his control until his death, and are now in the hands of his administrator. The sale took place in March, 1830, and this bill was filed in March, 1848.

2. The answer sets up the statute of limitations as a defence to the bill, and there is no charge in the bill of any coverture or infancy or any other matter which avoids it. The exceptions to the statute, not being in the pleadings, no evidence could be received in relation to them ; for the evidence, to be admissible, must be founded on some allegation in the pleadings. The doctrine is now clearly established that, if the statute of limitations is relied on as a bar, the plaintiff, if he would avoid it by any exception in the statute, must explicitly allege it in his bill, or, instead of replying, he must, according to the modern practice, amend his bill, if it contains no suitable allegation to meet the bar. (*Pratt* v. *Vattier*, 9 Pet. 416.)

3. But we will consider the cause as though the facts in avoidance of the bar of the statute were in the pleadings. If we are correct in what has been said before, this cause of action accrued between the years 1825 and 1835 ; consequently, under the eleventh section of the third article of the act concerning limitations, in the code of 1835, the limitation contained in the code of 1825 is that by which it is governed.

By the act of 1825, one entitled to bring any personal

action, if out of the United States, beyond seas, an infant or *feme covert* at the time the cause of action accrued, is allowed to bring his or her action within such time as such action is before limited after their respective disabilities are removed. It is now settled that the term " *beyond seas*," in the act of 1825, does not mean out of the limits of the state ; consequently, if a person is absent from this state in one of the United States, he is not within the exception of the statute. ( *Marvin* v. *Bates*, 13 Mo. Rep. 217. *Fackler* v. *Fackler*, 14 Mo. Rep. 431.)

4. Clarissa, the youngest child, was an infant at the time the cause of action accrued. She was born in November, 1822, and was of age in November, 1843. She was married in 1837 or '38. Now her marriage did not merge her disability of infancy, nor did it prolong her right to sue, as it did not exist at the time her cause of action accrued. It was a cumulative disability, and therefore not allowed. By the statute, she had five years within which to bring her action, after the disability of infancy was removed. Her husband's failure to sue, although he might have brought an action, did not affect her right to sue within the time allowed by the exception. ( *Robertson* v. *Wardeman*, 2 Hill (S. C.) Rep. 324. Angel on Limitations, 206–7–8–9. *Butler* v. *Howe*, 13 Maine, 400. *Wood* v. *Aiken*, 1 Paige Chan. 616.) According to this, the statute had not run against Clarissa, at the time this suit was commenced in March, 1848. The five years would have been out in November following, and she would have been barred. Her two elder full sisters would be barred, as the five years would have expired as to them, from the removal of their disability of infancy, it being less than a year within the time of expiring as to a younger sister. It matters not when they were married, as they were single when the cause of action accrued, as we have seen that marriage, occurring after the cause of action has accrued, does not prolong the protection of the statute. As to the two sisters by the first wife, it does not appear when they were born, or when they were married. If they were both under age and married at the time of the accruing of the action,.

then both disabilities must be removed before the statute will run against them. If they were adults and married, at the time of the accruing of the action, their coverture, so long as it continues, will prevent the running of the statute. Of course, the same marriage or coverture is meant, as existed at the time the cause of action accrued.

5. It thus appears that some of the plaintiffs are barred and some are not. What effect will this have? If it be true that, in the application of the statute of limitations, courts of equity are governed by analogy to its application in suits at law, then it would seem that, as at law, in all actions jointly instituted, unless all the plaintiffs are under disability, the operation of the statute is not arrested, a disability existing on the part of one of the plaintiffs will not prevent the running of the statute against all of them. The application of this rule in equity would seem to be less harsh than at law; for, in equity proceedings, if one plaintiff will not join, he may be made a defendant. In the case of *Riden and others* v. *Frion*, (3 Mur. (N. C.) Rep.) in an action of detinue for slaves descended to three heirs, it was held that the infancy of one of them did not prevent the running of the statute. The other heirs not being entitled to the protection of the statute, the suit was barred as to them, and being barred as to some, it was barred as to all. The case of *Perry* v. *Jackson*, (4 Term Rep. 516,) was on a bill of exchange by several plaintiffs. It was held that, though one of the parties was not barred by reason of his disability to sue, yet one being barred, all were barred. In *Marsteller* v. *McLean*, (7 Cr. 156,) which was an action for mesne profits, the same doctrine was maintained. In *Turner* v. *Debell*, (2 Mar. (Ky.) Rep. 384,) suit was brought by two executors, and it was held that the disability of one of them did not prevent the statute from running.

The same rule prevails in real actions, if the tenants unite in a joint demise. In such case, the disability of one of the joint tenants does not aid the others. If one is barred, all are barred. By making a separate demise, and suing for his own

interest, he who has been under a disability may recover his share. But if he sues jointly with others who are barred by the statute, he will not be protected. (*Roe* v. *Rowlston,* 2 Taun. 445.)

6. Then there are two objections to this suit. First, that the statute of limitations is set up in the answer as a defence, and there is nothing in the bill which avoids the effect of that bar ; second, courts of equity, applying the statute of limitations, enforce it as it is enforced at law, and as at law a joint action being barred as to some of the plaintiffs, is barred as to all, some of the plaintiffs in this suit being excluded from the protection of the statute, all are excluded. As these objections may be obviated by amendments, and as a dismissal of the bill might enable the party to plead the statute of limitations against Clarissa, if not against others, the decree will be reversed and the cause remanded.

7. This course will render necessary an expression of our opinion as to the conduct of William Keeton in relation to the slaves entrusted to him as administrator. The facts established by the evidence abundantly show that the sale made by him was a feigned one ; that he was guilty of a fraud, and converted his intestate's estate to his own use. He was poor and thriftless, unable to pay his debts before he became administrator. Suddenly he becomes rich and is, to all appearance, a man of wealth. This is not accounted for in any way. It does not appear that he was enriched from any other source, or by any other means. His apparent prosperity can only be ascribed to the possession of John Keeton's estate. Most if not all the witnesses who were present at the sale, inform us that William Keeton was the purchaser of most of the slaves. The bill of sale to Elizabeth Keeton seems to have been an after thought. It was dated in April, 1832, more than two years after the pretended sale, and within a few days thereafter, a bill of sale is executed by Elizabeth Keeton to William Keeton, reconveying the slaves. The bill of sale to E. Keeton is made to recite the falsehood that the slaves were delivered to her at the adminis-

tration sale, at which it is pretended she bought them, when all the evidence shows that William Keeton always retained possession of them. It is recited therein, that it was made in satisfaction of alleged advancements of William Keeton to John Keeton's estate, amounting to the sum of $2,691. Now the order of court under which the sale took place, recited that the debts against the estate, for the payment of which the sale was made, only amounted to the sum of one thousand dollars and upwards. If William Keeton had made advancements to the estate, why were they not passed upon and allowed before the sale and their payment provided for? The sale was also made to enable the administrator to make distribution of the slaves among the heirs. It would seem then, that this was a winding up of the estate. Is it not singular, then, that it should not appear until after this step that the estate was indebted to him for advancements, and that too, in an instrument signed by a confiding sister, who unfortunately found out too late that her confidence had been betrayed? The administration sale of the slaves was without notice of its terms. Against the usual course in such sales, it was made for cash, causing a diminished price for the slaves, and producing dissatisfaction among those attending it.

It is unnecessary to pursue this subject farther. Every circumstance is against the fair dealing of William Keeton, and there is nothing in the record to relieve his administration of John Keeton's estate from the imputation of fraud and mismanagement under which it rests and must rest.

The plaintiffs will have leave to amend, and the decree is reversed and remanded, with the concurrence of the other judges.