Sutton v. Dameron.

----

## SUTTON v. DAMERON *et al.*

1. **Ejectment**: PRACTICE. There is no limit to the number of ejectment suits that may be maintained between the same parties, even though the defenses be the same and the title and possession in all respects similar in their facts, provided equitable defenses are not interposed and ruled upon, thereby converting the whole proceeding into an equitable one, and making the adjudication binding.

Sutton v. Dameron.

2. ———: ———: BILL OF PEACE. One who has been successful in two or more actions of ejectment, involving the same issues and facts, may, in order to prevent being further harassed, maintain his bill of peace, and thus put a stop to oppressive litigation.

3. ———: ———: ESTOPPEL. Since a judgment in ejectment is not binding upon the parties to it, the agreed statement of facts upon which it is based is equally inconclusive and is not a bar to a second suit between the same parties.

4. Estoppel: CERTAINTY TO EVERY INTENT. It is of the essence of all estoppels, especially where the matters relied upon to estop are committed to writing, in the form of records of court, that they must be certain to every intent and are not to be sustained by argument or inference.

5. ———: ———. The recital, in an agreed statement of facts, upon which a judgment in ejectment is based, that "A died in 1874, intestate, and her husband died in 1864, intestate," is not such a precise affirmation that A was a *feme covert* at the time of her husband's death as will estop the defendants in a partition of the same lands, in which A's grantors are plaintiffs, from showing that she was divorced from her husband in 1860, and was a *feme sole* at the time she executed a certain deed of trust.

6. Limitations: DEVISE: LEASE. The statute of limitations will not begin to run against a devisee during the existence of a lease of the devised lands executed by the testator. Where such lease expired in 1865 and the devisee, though laboring under no disability, failed to assert his rights against one holding adversely until 1876, he will be barred by the statute of limitations, and his grantor, whose title was acquired after the bar of the statute attached, will also be barred.

7. Ejectment: PRACTICE. In ejectment, some may recover and others not, according to the evidence, regardless of the number of parties.

8. Appellate Practice. A party not appealing will not be heard in the appellate court to complain of the rulings of the trial court.

*Appeal from St. Louis City Circuit Court.*—HON. A. M. THAYER, Judge.

REVERSED AND REMANDED.

*G. M. Stewart* for appellants, Henry L. Sutton and William P. Hill.

(1) The stipulation filed and used in the case of *Sutton v. Casseleggi*, and received in evidence in the case at bar, cannot be impeached or contradicted in this case by any of the parties or their privies in estate. It became a part of the record and is conclusive on the parties and their privies in estate. *Munford v. Wilson*, 15 Mo. 540; *Ford v. Cameron*, 19 Mo. App. 467; *Van Horn v. Railroad*, 69 Iowa, 239; *McCann v. McLennan*, 3 Neb. 25; *Morgan v. Corlies*, 81 Ill. 72; *Hotel v. Seymour*, 54 Vt. 582; *Leonard v. White*, 5 Allen, 177; *Everett v. City*, 12 Allen, 93; *Bingham v. Supervisors*, 6 Minn. 136; *Shan v. Henderson*, 7 Minn. 480; *Staples v. Parker*, 41 Barb. 648; *Owen v. Cawley*, 36 N. Y. 600; *Mark v. City*, 87 N. Y. 184; *Matter of Pet. of Railroad*, 98 N. Y. 447; *Van Aernam v. Bliesstein*, 102 N. Y. 355; *Klienschmidt v. Morse*, 1 Mont. T. 100. (2) The judgment in the case of *Sutton v. Casseleggi* is an estoppel as to Paulina Dalton and her privies in estate. *Chouteau v. Gibson*, 76 Mo. 38; *Forder v. Davis*, 38 Mo. 107; *Spitts v. Wells*, 18 Mo. 468; *Preston v. Rickets*, 91 Mo. 320; *Adams v. Barnes*, 17 Mass. 364. (3) Abbie Dodd being privy in estate with Pauline Dalton, the same rule as to estoppel applies to her as to the latter. *Thistle v. Buford*, 50 Mo. 278; Freeman on Judgments [3 Ed.] sec. 162. (4) Whatever her relation to the *Casseleggi case*, Abbie Dodd bought her interest *pendente lite* and must abide the result of that litigation. *O'Reilly v. Nicholson*, 45 Mo. 160; *Turner v. Baff*, 60 Mo. 342; *Koehler v. Beenicker*, 63 Mo. 368; *Bank v. Collonious*, 63 Mo. 290; *McIlwrath v. Hollander*, 73 Mo. 112; *Hall v. Morgan*, 79 Mo. 50.

*Thos. Thoroughman* and *J. K. Hansbrough* for appellant, Abbie Dodd.

The decision in *Sutton v. Casseleggi*, 77 Mo. 397, is not binding and conclusive on appellant Abbie Dodd as to the validity of the deed of trust of Archange

McDowell, under which she claims in this suit. *Kimmel v. Benna*, 70 Mo. 52; *Hogan v. Smith*, 11 Mo. App. 314; *Ekey v. Inge*, 87 Mo. 493; *Avery v. Fitzgerald*, 94 Mo. 207. (2) By statute of limitation, Abbie Dodd is entitled to two forty-eighths of the property derived by John B. McDowell, under the will of Rosalie Chataigne. (3) Dameron's interest should be charged with the payment of the taxes accruing during the years 1882 and 1883, while Jamison owned it, and collected the entire rents.

SHERWOOD, J.—This is an equitable proceeding for the partition of a lot of ground in the city of St. Louis. The agreed statement of facts, which formed part of the evidence, in the action of ejectment, in the cause of *Sutton v. Casseleggi*, 77 Mo. 397, and which it is insisted by appellants, Sutton and Hill, forms a complete bar to any further recovery by Abbie Dodd, than that accorded to her predecessor in title, Pauline Dalton, in that cause, is as follows :

"It is admitted in the trial of the cause that Joseph Montaigne is the common source of title to the lot sued for, and owned the said lot in fee on the eighth day of June, 1818; that J. Baptiste Robidoux had disappeared for several years from his family and his home, and Rosalie Robidoux came from Canada to St. Louis with her daughter Archange, in the year 1817; that, soon after Rosalie came to St. Louis, she being regarded as a widow, and her husband, Robidoux, as dead, one Lange Allard took her as his wife, and lived with her as such during the year 1818, and until J. Baptiste Robidoux appeared in St. Louis and claimed his rights as a husband, in the year 1819. Lange Allard left and went up to the mountains and died there within a few years. J. B. Robidoux lived with his wife, Rosalie, in the city of St. Louis, from 1819 up to the time of his death in 1826. His widow, Rosalie, thereupon married Paul Morris, who died in 1832, and after the death of

Morris the widow married Victor Chataigne, in 1836, and they lived together as husband and wife until 1853, when he died, leaving said Rosalie, his widow, surviving him. Said Rosalie died the eighteenth day of October, 1858, leaving her last will, that was probated on the twenty-first day of October, 1858. Archange, her daughter, had married one McDowell, in 1836, and had issue of said marriage five children—Robert A., John B., Emily, Rosalie and Mary. Mary died in 1863, intestate and without issue. All of the surviving children of McDowell were of the age of twenty-one years on December 5, 1861. Emily married Joseph W. Renfrow in 1863, and Rosalie married James A. Maclay in 1864. Archange McDowell died in 1871, intestate, and her husband died in 1864, intestate. Laurent Robidoux is still alive, and has eight children, who are all alive. The net rents, over and above taxes, were eleven hundred and thirty-seven dollars, prior to 1873, and nine hundred and thirty-seven dollars a year since January 1, 1873. The said Mary McDowell was eighteen years and eight months old on the sixth day of December, 1861. The said Pauline Dalton has all the right, title and interest in and to said premises sued for which was vested in her husband, John Dalton."

A portion of a succinct statement of the deductions made from that agreed statement, as well as from other facts in evidence in that cause, by Commissioner MARTIN, can be properly inserted here: "Joseph Montaigne was the original owner of the premises. On the eighth day of June, 1818, he conveyed the lot to Lange Allard and Rosalie Allard, his wife. Rosalie Allard was not his wife, but was in truth Rosalie Robidoux, who had left her husband in Canada and was cohabiting with Allard as his wife. This deed gave the land to Lange Allard and Rosalie as tenants in common, Rosalie thereby becoming vested with one undivided half in fee, while the other half vested in

VOL. 100—10

Allard. In 1819, J. Baptiste Robidoux, her lawful husband, hunted up his wife in St. Louis, claimed his marital rights, and lived with her till his death in 1826. Before the death of Robidoux, Lange Allard, who had given Rosalie back to him, conveyed on the eighth day of June, 1818, the undivided one-half of the land to Horatio Cozzens, as trustee for Rosalie, for life; with remainders as to said half in fee to Laurent and Archange, son and daughter of Rosalie by Robidoux, her husband. At this date the title stood one-half in Rosalie in fee, the other half in her for life, with remainder in fee as to that half in Laurent and Archange, one fourth in each undivided. Thus stood the title at the death of Robidoux in 1826. It remained unchanged in November, 1828, at which date Rosalie married Paul Morris, which fact is evidenced by a marriage contract of that date. He died in 1832. In 1836 Rosalie married Victor Chataigne, her third and last husband, with whom she lived till his death in 1853. The title remained unchanged at the death of Rosalie, which took place in 1858. It appears in evidence that by herself or tenants she had occupied the lot up to the time of her death.

" She left a last will by which, after certain other devises, she willed all the rest and residue of her estate, one-third to Laurent, one-third to the children of Laurent, and one-third to the children of Archange. These two persons were her son and daughter. This will carried to the devisees all that she died seized of, to-wit, one-half undivided. As to the other half undivided she had possessed only a life-estate, which terminated at her death. Thus her decease left the title one-fourth in Laurent and one fourth in Archange, which came to them from the deed of Lange Allard, made in June, 1821. The other half of which Rosalie had died seized in fee by virtue of her will vested, as to one-third of one-half or one-sixth, in Laurent, one-sixth in the children of Laurent, and one-sixth in the children

Sutton v. Dameron.

of Archange.   The devolution of the record title is very clear.   No one could claim any part of this title except by deed, devise or descent from Laurent or Archange, or the children of Laurent or Archange.

"According to the statement of facts, Archange married one McDowell in 1836, and had issue five children: Robert A., John B., Emily, Rosalie and Mary. Mary died intestate in 1863, without issue, leaving her brothers and sisters to inherit her share.   Emily married Renfrow in 1863, Rosalie married Maclay in 1864, Archange, the mother, died intestate in 1871.   Laurent is living with eight children, all alive.

"The plaintiff submitted three deeds from three of the four heirs of Archange, Robert, Emily and Rosalie, Jr., all made on the thirteenth day of April, 1873. These four heirs, as we have seen, acquired one-fourth from the Allard deed, as heirs of Archange, and one-sixth from their grandmother's will.   These three deeds from three of the four heirs gave to plaintiff three-fourths of the one-fourth coming from Allard, and three-fourths of the one-sixth coming by the grandmother's will, amounting to one-eighth, making in all fifteen forty-eighths.   There was no valid deed given in evidence taking any part of this title from the plaintiff or his grantors.   The court of appeals held that as to the portion coming through the conveyance from Allard the title was lost by the statute of limitations, and allowed recovery only for the one-eighth coming by the will of Rosalie, their grandmother, and the plaintiff comes here by appeal, insisting that under the law and evidence he is entitled to have judgment for the three-fourths of the one-fourth denied to him by the circuit court and court of appeals, being nine forty-eighths of the whole.

"It is necessary for us to consider the facts relied upon by the defendant for defeating this portion of the plaintiff's title.   But, before doing this, I may as well call attention to the record title submitted in evidence by Pauline Dalton, the defendant.   It consisted of a

deed of trust by Laurent and wife to secure a debt of four thousand dollars, dated March 2, 1861, and the deed of the trustee to John Dalton, dated January 29, 1862. This placed in Dalton the one-fourth acquired by Laurent from the Allard deed, also the one-sixth acquired by the will of his mother, which would be five-twelfths or twenty forty-eighths of the whole. By the agreement in the case, Pauline Dalton is possessed of all the title acquired by John Dalton, which, as we have seen, amounted to twenty forty-eighths. There remained five forty-eighths outstanding in John B., the son of Archange, and eight forty-eighths in the children of Laurent, none of whom are parties to this suit.''

Under the judgment in the cause, aforesaid, as already seen, to Pauline Dalton, the successor in title to John Dalton, who was the successor in title of Laurent Robidoux under the deed of trust sale, there were adjudged twenty forty-eighths of the entire title. The deed of trust was executed by Laurent Robidoux March 2, 1861, and foreclosed January 29, 1862. But, as will be seen from the case cited, at the same time that Laurent Robidoux executed the deed of trust on his portion of the title, Archange McDowell also executed one upon her portion, to-wit, twelve forty-eighths, derived from the Allard deed, which deed of trust was foreclosed and a sale thereunder occurred on the same day on which the deed of trust given by Laurent Robidoux was foreclosed; so that, if these two sales under these deeds were valid, they passed to John Dalton, and subsequently to his successor in title, Pauline Dalton, the entire Allard title, twenty-four forty-eighths, as well as the portion derived by Laurent Robidoux from the will of Rosalie, his mother, to-wit, eight forty-eighths, making in all thirty-two forty-eighths of the entire title, and leaving to be accounted for sixteen forty-eighths of the title, being all that portion of the same held by the children of Laurent Robidoux, to-wit: Eight forty-eighths, and a

Sutton v. Dameron.

like portion by the children of Archange McDowell, derived in each instance from the will of their common grandmother, Rosalie.

But before investigating further as to the sixteen forty-eighths, it is opportune to determine whether Pauline Dalton did obtain so much as thirty-two forty-eighths of the title. It is a conceded fact that Pauline Dalton acquired all the interest Laurent Robidoux had in the premises, to-wit, twenty forty-eighths, by reason of the foreclosure of the deed of trust he gave and this was the amount adjudged to her in the ejectment cause aforesaid; but it is disputed that Pauline Dalton is to be considered as having acquired any interest whatever in the twelve forty-eighths which represent the amount derived by Archange McDowell through the Allard deed, and this dispute is based upon Archange being a married woman in 1861, when she gave the deed of trust. This contention is made *not upon the fact of coverture* of Archange in 1861, but upon the ground that the agreed statement of facts made in the *Sutton-Casseleggi case*, aforesaid, as well as the judgment thereon do each constitute a complete bar, an estoppel by record, forbidding the introduction of evidence to establish the truth as to the coverture of Archange at the time mentioned. It may be conceded that if Pauline Dalton was concluded by the matters aforesaid, then that Abbie Dodd, who purchased her interest from her, is likewise concluded. But do any of the things which occurred in the *Sutton-Casseleggi case* conclude Pauline Dalton?

The well-settled rule of law in this state, notwithstanding an improvident *dictum* in *Foster v. Evans*, 51 Mo. 39, to the contrary, is, actions of ejectment though between the same parties having the same defenses concerning the same title and possession, and in all respects similar in their facts, may be maintained *ad infinitum*, so long as equitable defenses are not interposed and ruled upon, thereby converting the whole

proceeding into an equitable one, and thus making the adjudication binding. *Kimmel v. Benna,* 70 Mo. 52; *Ekey v. Inge,* 87 Mo. 493; *Avery v. Fitzgerald,* 94 Mo. 207; *City v. Lumber Co.,* 98 Mo. 613.

For this cause it is that when two or more ejectments are brought, and decided in favor of the defendant, he, in order to prevent being further harassed by a litigious adversary, may maintain his bill of peace and thus put a stop to oppressive litigation. *Primm v. Raboteau,* 56 Mo. 407. But if a judgment in ejectment is not a bar to another suit of the same sort between the same parties litigant, then it must stand for true that an agreement of facts made for the mere purpose of convenience in having the particular cause tried, which results in such a judgment, a *mere incident thereof,* cannot be a bar ; in other words, if the *judgment itself* does not bind, certainly the admitted facts upon which that conclusion of law is based should be equally inconclusive.

But there is another reason which will be presently given, a reason of such cogency that it would allow a judgment in an ejectment cause to be regarded as *res judicata,* and a stipulation of parties filed in such a cause deemed equally binding ; and yet would deny to the stipulation under discussion any such force or effect. It will have been observed that, near the conclusion of that stipulation, these words occur : "Archange McDowell died in 1871, intestate, and her husband died in 1864, intestate." From these words the inference was drawn in the *Sutton-Casseleggi* cause, that Archange McDowell was a *feme covert* in 1861, and this inference was quite natural. But it must not be forgotten that it is of the very essence of all estoppels, especially where the matters relied on to estop are committed to writing in the form of a court paper, that, as they are intended to preclude a man from alleging the truth, they must be *certain to every intent,* and are not

to be sustained by argument or inference; there must be a *precise affirmation* to have this effect. Co. Litt. 352*b*; Viner, Estoppel, A. 2; 4 Kent's Com. 261, note; Bigelow, Estop. [3 Ed.] 302, 311, 312; Best's Prin. Ev. (Chamberlayne) 527; *Pelletreau v. Jackson*, 11 Wend. 110; *Jackson v. Allen*, 120 Mass. 64; *Carver v. Jackson*, 4 Pet. 83. And the reason given for the necessity of an estoppel being certain to every intent is, "for no one shall be denied setting up the truth, unless it is in plain and clear contradiction to his former allegations and acts." 1 Greenl. Ev., sec. 22.

In the stipulation aforesaid, it will be noticed that there is no "*precise affirmation*" that Archange McDowell was a *feme covert* at the time of her husband's death in 1864; it is a mere matter of *inference or argument* that such must have been the case. This being so there was *no estoppel* in the present instance, so that the court below very properly admitted evidence to show that Archange had been divorced from her husband in 1860, and, consequently, was a *feme sole* when she executed the deed of trust which, being foreclosed in 1862, swept away all of her interest, to-wit: Twelve forty-eighths, being one-half of that derived from Allard. This conclusion gives the successor in title of Pauline Dalton, Abbie Dodd, an indisputable right to thirty-two forty-eighths of the entire title, which was the quantity awarded to her by the decree of the circuit court.

And this conclusion also deprives Sutton, the plaintiff in the ejectment suit, and trustee for William P. Hill and plaintiff in this proceeding, of nine forty-eighths of the title he was supposed to have acquired by deed in 1873 from three of the four children, heirs of Archange, who, by reason of their mother being a *feme sole* in 1861, got nothing from, or of, the Allard title; and only what they obtained from their grandmother's will, to-wit: Six forty-eighths of the title devised by

her, and leaving two forty-eighths thereof outstanding in John B. A. McDowell, also the child and heir of Archange, who did not join in the ejectment suit instituted in 1873, by Sutton, to whom the trial court awarded the said six forty-eighths, in his capacity as trustee, and awarded to William P. Hill two forty-eighths of the title in his individual capacity, he having purchased and acquired by deed the interest of John B. A. McDowell in the premises, on the fifteenth day of August, 1883, which, as already stated, was only two forty-eighths of the title.

The rights of all the parties to this proceeding were adjusted and finally settled in the lower court, save those of Sutton, the plaintiff and trustee in this proceeding of William P. Hill, and William P. Hill in his own behalf, and they have appealed to this court and so has Abbie Dodd; Hill appeals from the allotment to Abbie Dodd; Sutton does the like; and Abbie Dodd appeals from the allotment to Hill, claiming that to her belong the two forty-eighths which Hill obtained by the decree below.

There is no question made by any of these appellants, whether plaintiff or defendants, as to the other shares distributed by the said decree which, in addition to those already mentioned, awarded to E. C. Dameron the four forty-eighths formerly held by W. C. Jamison, to Paul, Charles, Mark and Joseph Robidoux, children of Laurent Robidoux, each one forty-eighth, thus filling out the requisite number of shares, and completing the integer of title. So that the point to be considered is whether the claim of John B. A. McDowell was barred by limitation before the institution of this equitable partition, which occurred the thirtieth day of January, 1884.

From the conclusion already announced John B. A. McDowell took nothing from his mother, Archange, and only his proportionate part of the one-third of one-half, which his grandmother devised by her will to

Archange's children being one-sixth or three forty-eighths of the whole title; but as there were four children among whom these shares were to be divided he of course was only entitled to one-fourth of that one-sixth equal to two forty-eighths. But not only did he take no part in the *Sutton-Casseleggi* litigation begun on the second of November, 1873, but as already stated he did not make conveyance of his interests to Wm. P. Hill, until August 15, 1883.

The record in the *Sutton-Casseleggi case* was read in evidence by both parties in the case at bar; from which it appears that John Dalton took the exclusive and adverse possession of the premises as the owner thereof on May 1, 1862, receiving all the rents therefrom, and dying in 1864; his wife Pauline, as his successor in title, continued such adverse possession in the same manner certainly until the cause was tried in 1876, and no writ of restitution was awarded therein, until after the return of that cause, when such a writ issued and Sutton was put in possession on January 30, 1884, of the fifteen forty-eighths title adjudged to him by the second judgment of the circuit court under the mandate of this court. How much longer she actually remained in possession after the first judgment in the circuit court in 1876, in favor of Sutton for six forty-eighths of the title does not appear, nor is it material to know; for a possession of such a duration, as has been mentioned, was sufficient to confer a title on Pauline Dalton as against any one not a party to the ejectment suit. But there are some other considerations to be adverted to presently on this point.

The agreed statement shows that all of the children of Archange were of age in 1861; but taking as they did, solely under the will of their grandmother, Rosalie, and she having leased the premises on the first of May, 1850, for the term of fifteen years to Little, of course his lease would not expire until May 1, 1865, and the

rights of Archange's children would be subordinate to the lease; therefore, the statute would not run against them though of age in 1861, until the expiration of the lease May 1, 1865. This was so ruled in the *Sutton-Casseleggi case.* So that from that period, on to some time in 1876, the statute would run as to any one not asserting his rights to the premises, during that period; and this was the attitude of John B. A. McDowell, under whom, as before stated, William P. Hill claims. This claim must, therefore, be ruled as barred.

The position is indeed taken by counsel that though McDowell was not a participant in the ejectment litigation, yet that the decision therein, in favor of Sutton, as the grantee of the other heirs of Archange McDowell, operated as much in favor of the heir not conveying as in favor of those who did; that unless all were barred none were. This position, however, is untenable. In *Keeton's Heirs v. Keeton's Adm'r*, 20 Mo. 530, it was recognized that one or more parties having interests in common may be barred, while the others are not, though it was also ruled that those not barred could not unite in action with those who were. Owing to a change in the statute, however, so far as concerns real estate, no matter how many parties join in an action of ejectment, some recover and others not according to the evidence adduced; some may be barred and others not. R. S. 1879, sec. 2249; *Miller v. Bledsoe*, 61 Mo. 96.

We, therefore, hold that J. B. A. McDowell being barred by the statute, Hill as to the two forty-eighths was barred also, and that, in consequence thereof, those shares accrued to the benefit of John Dalton and those claiming under him, in whose favor the statute had run. For this reason, to Abbie Dodd should also have been awarded the shares aforesaid, thus giving to her thirty-four forty-eighths of the shares in controversy.

A single point remains for discussion; it is this: The lower court in its decree charged E. C. Dameron's

four forty-eighths of the title, derived from William C. Jamison, with the amount of the rents collected by Jamison on the entire property between 1878 and 1884, and appropriated to his own use, on the ground that, having purchased said shares with knowledge of such conversion, he bought subject to such charge, which the court by its decree would enforce.   This portion of the decree it is unnecessary to discuss, because Dameron does not appeal; but it was insisted that not only should the charge already mentioned be enforced against Dameron's interests but that, in addition thereto, such shares should be charged with taxes which Jamison, having the rents in his hands, should have paid, but failed to pay.   The trial court refused to sanction this claim and we have been presented with no reasons and cited to no authorities showing why we should sanction it; and we refuse to do so.

For the error aforesaid, we reverse the decree, and remand the cause with directions to proceed in conformity to this opinion.   All concur, but BARCLAY, J., not sitting.